IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KARI JO DANIELS, | ) | |
| Plaintiff, | ) | CASE NO. 4:14CV1644 |
| | ) | |
| v. | ) | MAGISTRATE JUDGE GREG WHITE |
| | ) | |
| CAROLYN COLVIN, | ) | |
| Acting Commissioner of Social Security | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Kari Jo Daniels ("Daniels") challenges the final decision of the Acting Commissioner of Social Security, Carolyn Colvin ("Commissioner"), denying her claim for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423, 1381 *et seq.*  This matter is before the Court pursuant to 42 U.S.C. § 405(g) and the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the final decision of the Commissioner is AFFIRMED.

## I.  Procedural History

On August 26, 2009, Daniels filed applications for POD, DIB, and SSI alleging a disability onset date of March 4, 2009 and claiming she was disabled due to "diabetic/neuropathy in feet/asthma/anemia."  (Tr. 232-238, 266-267.)  Her application was denied initially in December 2009.  (Tr. 19, 124-127.)  On December 17, 2010, Daniels re-filed her claims for POD, DIB, and SSI, alleging an onset date of March 4, 2009 and disability based

on feet problems, diabetes, and arthritis.  (Tr. 242-251, 321-322.)  These claims were denied both initially and upon reconsideration. (Tr. 128-130, 131-133, 134-136, 137- 139.)  Daniels requested an administrative hearing.

On May 2, 2013, an Administrative Law Judge ("ALJ") held a hearing during which Daniels, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 40-78.)  On May 9, 2013, the ALJ found Daniels was able to perform a significant number of jobs in the national economy and, therefore, was not disabled.  (Tr. 19-33.)  The ALJ's decision became final when the Appeals Council denied further review.  (Tr. 1-3.)

## II.  Evidence

*Personal and Vocational Evidence*

Age thirty-seven (37) at the time of her administrative hearing, Daniels is a "younger" person under social security regulations.  *See* 20 C.F.R. § 404.1563(c) &  416.963 (c).  She has at least a high school education and past relevant work as a telemarketer, nurse's aide, fast food worker, and deli worker/cashier.  (Tr. 72.)

*Medical Evidence*

The record reflects Daniels regularly presented to Monhinder Singh, M.D., between 2008 and 2013 for treatment of her diabetes and other conditions.  In 2008, Daniels visited Dr. Singh on at least five (5) occasions and was variously diagnosed with diabetes-mellitus 2; diabetic neuropathy; hypothyroidism; hyperlipidemia; and, asthma.  (Tr. 450-452.)  During this time frame, Daniels was prescribed Levothyroxine; Lisinopril; Doxycline; Singulair; Tesslon; Norvasc; Lantis; Nuralog; Simvastatin; and, Neurontin.  *Id.*  Daniels was not noted as having edema during any of these visits, and was noted as "doing well" in October 2008.  (Tr. 452.)  Dr. Singh's treatment notes indicate Daniels missed three appointments in 2008.  (Tr. 451-452.)

In 2009, Daniels presented to Dr. Singh on at least seven (7) occasions.  (Tr. 453-457.)  She was again diagnosed with diabetes-mellitus 2; hyperlipidemia; migraines, and asthma, as well as with iron deficiency; dyslipidemia; GERD; and, morbid obesity.  *Id.*  Daniels was not noted as having edema at any of her 2009 visits with Dr. Singh, and was frequently described as

2

"doing well" and having "no complaints." *Id.* Her medications included Prilosec, Lantis, Novalog, Zocor, Topamax, and Levothyroxine. *Id.* Daniels missed five appointments with Dr. Singh in 2009. (Tr. 453, 454, 456, 457.)

The record reflects Daniels also received medical treatment in 2009 from emergency room ("ER") physicians and podiatrist Joseph Arters, D.P.M. Specifically, in February 2009, Daniels presented to the ER when she "caught her left ankle and foot on an uneven place." (Tr. 408.) Examination revealed swelling in the ankle and foot, but no joint instability. (Tr. 409.) X-rays of Daniels' foot and ankle were negative. (Tr 409, 411.) Daniels was diagnosed with a sprain and discharged. (Tr. 409.) Subsequently, on March 5 and March 25, 2009, Daniels presented to Dr. Arters with complaints of bilateral ankle pain. (Tr. 398.) She reported pain with prolonged standing, as well as swelling, and stated "the pain is so bad that she actually quit working because she cannot stand for a long period of time." *Id.* Dr. Arters observed "signs of neuropathy bilateral; pain with palpation of the ankle joint bilateral; . . some pain with motion; [and] some swelling in the area bilateral." *Id.* He diagnosed insulin dependent diabetes mellitus with neuropathy; morbid obesity; and, chronic ankle pain. *Id.* He counseled Daniels to lose weight, and referred her to a rheumatologist.[1] *Id.*

In 2010, Daniels continued to present regularly to Dr. Singh, seeing him on least seven (7) occasions. (Tr. 458-461.) Dr. Singh again diagnosed Daniels with diabetes mellitus 2 and diabetic neuropathy, as well as with hypothyroidism, dyslipidemia, migraines, morbid obesity, elevated liver enzymes, and asthma. *Id.* He prescribed multiple medications, including Novalog, Lantus, Synthroid, Singulair, Albuterol, Symbicort, Lipitor, and Lyrica, and advised Daniels to avoid butter, red meat, and cheese. (Tr. 458, 459.) In a December 2010 visit, Daniels complained of bilateral foot pain, stating she was experiencing sharp pain and could not stand. (Tr. 461.) Dr. Singh's treatment notes indicate X-rays of Daniels' feet showed early arthritis.

---

[1] Daniels also received treatment from ER physicians in August 2009, when she presented for treatment of constant, sharp pain in the fourth toe of her right foot. (Tr. 402- 403.) X-rays showed no evidence of fracture and/or dislocation. (Tr. 403- 404.) Daniels was discharged with a prescription for Ibuprofen. (Tr. 403.)

*Id.*  The record reflects Daniels missed six (6) appointment in 2010, and was described by Dr. Singh in a treatment note as "non-compliant with office visits in past."  (Tr. 458-461.)

On December 17, 2010, Daniels presented to podiatrist Mark Smesko, D.P.M., for a "diabetic foot check."  (Tr. 440-441.)  She complained of worsening foot cramping and pain, rating her pain a 10 on a scale of 10.  (Tr. 440.)  Dr. Smesko noted full muscular strength; significant stiffness to palpation and range of motion; diffuse pain in the heel and arch; and, dependent edema.  *Id.*  He diagnosed type 1 diabetes; plantar fasciitis; tenosynovitis; and, posterior tibial tendinitis bilaterally.  *Id.*  Dr. Smesko dispensed an Airheel and night splint, and advised Daniels to "wear good supportive shoes" and "keep her blood sugar under control."  (Tr. 441.)

Dr. Singh examined Daniels on at least eleven (11) occasions in 2011.  (Tr. 462-463, 495-498, 585, 520.)  She received similar diagnoses as in previous years, and was described as "doing well" and having no edema through April 1, 2011.  (Tr. 462-463, 495.)  However, on April 13, 2011, Daniels presented to Dr. Singh with complaints of swelling in her feet.  (Tr. 496.)  Dr. Singh's treatment notes from May 18, 2011 reflect two to three plus pedal edema, and state that Daniels "cannot stand on her feet."  (Tr. 496.)  Dr. Singh again noted bilateral pedal edema on May 25, 2011, and advised Daniels to restrict her fluid/water intake to 1.5 litres/day.  (Tr. 497.)

Dr. Smesko's treatment notes from this time period also reflect edema in Daniels' feet, ankles, and lower legs.  (Tr. 472-474, 505-506.)  Specifically, Dr. Smesko noted 1-2+ pitting edema in Daniels' bilateral lower extremities on April 11, 2011; significant swelling and pain on May 13, 2011; and 1+ pitting edema bilaterally on June 13, 2011.  (Tr. 474, 473, 505.)  Dr. Smesko prescribed orthotics; Juzo stockings bilaterally; and Unna boot compression wraps.  (Tr. 472-475.)  He also referred her for a Duplex ultrasound, which came back negative for deep vein thrombosis.  (Tr. 472-473.)  In treatment notes from June 13, 2011, Dr. Smesko stated that "there is not a lot more than I can do other than have her keep wearing her compression stockings, which I am not so sure she is wearing."  (Tr. 505.)  The record does not contain any further

4

treatment notes from Dr. Smesko after this appointment.

Dr. Singh's subsequent treatment notes from July, August and October 2011 do not reflect examination findings of edema.  (Tr. 585, 520.)  In fact, in an office visit on October 18, 2011, Dr. Singh described Daniels as "doing well."  (Tr. 520.)  The record reflects Daniels missed two appointments with Dr. Singh and four appointments with Dr. Smesko in 2011.  (Tr. 439, 475, 462, 520.)

In 2012, Daniels continued to present frequently to Dr. Singh, seeing him on at least twelve (12) occasions.[2]  (Tr. 521-523, 557-559, 625-627, 635.)  Treatment notes from January and February 2012 reference Daniels' disability "paperwork" and state she is "not able to work" due to pain and swelling in her feet.  (Tr. 521.)  Examinations from January through November 2012 do not reflect findings of edema.  (Tr. 521-523, 557-559, 625-627.)  However, on several occasions, Dr. Singh noted very high blood sugar results and described Daniels' diabetes as "uncontrolled" or "poorly controlled."  (Tr. 626, 627, 635, 523, 559.)  In May 2012, Dr. Singh referred Daniels for an EMG nerve conduction study of her bilateral upper and lower extremities.  (Tr. 522.)  This EMG was "suggestive of moderate sensory motor neuropathy probably diabetic in nature."  (Tr. 562.)  It also noted that "underlying median nerve entrapment at the wrist or distal to the wrist i.e., carpal tunnel syndrome cannot be ruled out."  *Id*.

On November 12, 2012, Dr. Singh completed a medical source statement regarding Daniels' functional limitations.  (Tr. 602-603.)  Therein, he concluded Daniels could lift and/or carry 10 pounds, citing as medical support that Daniels' "hands get numb-diabetic neuropathy." (Tr. 602.)  He also found that, because Daniels' "legs go numb," she could (1) stand and/or walk for a total of  1.5 hours and for 10 minutes without interruption; and, (2) sit for a total of 2 hours and for 15 minutes without interruption.  *Id*.  Dr. Singh further offered that, due to her morbid obesity and neuropathy, Daniels could never climb, balance, crouch, kneel or crawl; and, could only occasionally stoop.  *Id.*  He also found that Daniels' ability to handle, feel, and push/pull

---

[2]  The record reflects Daniels missed three (3) appointments with Dr. Singh in 2012.  (Tr. 521, 635.)

were affected by her neuropathy, but did not state to what degree.  *Id.*  Dr. Singh then concluded Daniels was restricted from heights, moving machinery, temperature extremes, chemicals, dust, fumes and humidity.  *Id.*  Finally, he concluded Daniels would be "off task" for 25% or more of a typical workday; and, would be absent from work  "more than four days per month" as a result of her impairments or treatment.  *Id.*  Dr. Singh also wrote that Daniels "cannot work."  *Id.*

In December 2012, Daniels presented to Dr. Singh complaining of hand numbness, leg pain, and swelling in her feet.  (Tr. 635.)  Dr. Singh noted 2+ pitting edema bilaterally.  *Id.*  He diagnosed diabetes-mellitus 2 "poorly controlled;" bilateral leg swelling; hyperlipidemia; asthma; and, diabetic neuropathy.  *Id.*  Dr. Singh again provided diet counseling; and prescribed Neurontin.  *Id.*

 Daniels presented to Dr. Singh on at least five occasions between January and March 2013, and was diagnosed with diabetes mellitus 2; morbid obesity; asthma; migraines; hypothyroidism; and, dyslipidemia.  (Tr. 633, 650-652.)  No edema was observed during these visits.  *Id.*  Daniels' body mass index (BMI) ranged between 51 and 53, and treatment notes reflect Dr. Singh provided diabetic education and weight counseling.[3]  (Tr. 650.)

On April 29, 2013, Dr. Singh completed another medical source statement regarding Daniels' functional limitations.  (Tr. 668-669.)  He again concluded that Daniels could (1) lift and/or carry 10 pounds; (2) stand and/or walk for a total of 1.5 hours and for 10 minutes without interruption; (3) sit for a total of 2 hours and for 15 minutes without interruption; (4) never climb, balance, crouch, kneel, or crawl; and, (5) occasionally stoop.  *Id.*  Dr. Singh also found that Daniels' handling, feeling, pushing/pulling were affected by her morbid obesity and neuropathy; and, that she was restricted from heights, moving machinery, temperature extremes, chemicals, dust, fumes and humidity.  (Tr. 669.)  Finally, he again concluded that Daniels would be "off task" for 25% or more of a typical workday; and, would be absent from work  "more than

---

[3] The record also reflects Daniels was hospitalized from April 11, 2013 to April 15, 2013 due to a urinary tract infection.  (Tr. 654-666.)  Hospital records indicate that no edema was observed. (Tr. 654.)

four days per month" as a result of her impairments or treatment.  *Id*.  Dr. Singh also again

indicated that Daniels "cannot work."  *Id*.

### Hearing Testimony

During the May 2, 2013 hearing, Daniels testified to the following:

- She lives in a trailer with her husband and two children, ages 17 and 16.  (Tr. 46-48.)

- She graduated from high school.  (Tr. 50-51.)  She worked full-time as a telemarketer in 1998 and 1999.  (Tr. 58.)  She then worked in food service and as a nurse's aide.  (Tr. 57.)  From 2004 to 2008, she worked full-time as a Shift Leader at Dairy Queen, where she supervised five people.  (Tr. 56-57.)  From August 2008 to March 2009, she worked full-time at the airport as a cashier and food preparer.  (Tr. 55-56.)  In March 2009, she stopped working because of pain and swelling in her feet.  (Tr. 53.)

- From 2009 to 2010, she attended Ohio Valley College of Technology, where she studied to be a medical assistant.  (Tr. 51.)  She graduated in 2010 with a GPA of 3.6.  *Id*.  This program was full-time, and included an externship which required 360 hours of work.  (Tr. 51, 54.)  She satisfied her externship requirement by working at the front desk of a chiropractor's office.  (Tr. 54.)  In this position, she scheduled patients, checked them in, and answered the phone.  *Id*.

- She was diagnosed with diabetes in 2000.  (Tr. 67.)  She checks her blood sugar four times per day, which generally ranges between 150 and 270.  *Id*.  She also suffers from asthma and anemia.  (Tr. 59, 66.)  She takes Novolog, Lantus, Metformin, and Bydureon for her diabetes.  She also takes Neurontin for pain; Symbicort for asthma; Synthroid for her thyroid; Lisinopril for excessive protein; and an iron pill for her anemia.  (Tr. 59, 66.)  She experiences dizziness as a side effect from her medications.  (Tr. 60.)

- She is unable to work because of pain in her feet and legs, and numbness in her hands.  (Tr. 58.)  She cannot stand for very long and sitting "bothers her."  *Id*.  She has problems walking due to her foot pain and swelling.  (Tr. 64-65.)  Her hand often goes numb, causing her to drop things.  (Tr. 58.)  She can lift a half gallon of milk, but not a full gallon.  (Tr. 68-69.)

- She can stand for 15 minutes before her feet begin to swell.  (Tr. 63-64.)  She then has to sit down and elevate her legs.  *Id*.  She can sit for 15 to 20 minutes before needing to stand up due to pain in her hips and legs.  (Tr. 64.)  She cannot wear shoes because of foot swelling.  (Tr. 65.)  She does not walk for exercise, and cannot walk through a store because her feet swell.  (Tr. 64-65.)  Her condition has worsened since December 2012, when her feet "got really swollen."  (Tr. 65-66.)

- She takes her asthma medication two to three times per day.  (Tr. 66.)  She experiences shortness of breath twice per day, even when she is "just sitting there." Walking and showering also cause her to feel short of breath.  *Id*.

- She needs help putting on her socks and shoes.  (Tr. 60.)  She does not cook, wash

7

dishes, do the laundry, vacuum, or sweep.  (Tr. 60-61.)  She folds clothes twice per month.  (Tr. 61.)  She goes shopping once week, but is not able to walk through the store because of her foot pain and swelling.  (Tr. 60, 65.)  Rather, she uses a wheelchair or electric scooter when shopping.  (Tr. 64-65.)

- She leaves her trailer twice a week, either to go shopping or for doctor appointments.  (Tr.  48, 60.)  She does not drive, and has never had a driver's license.  (Tr. 48.)  Primarily, she stays in her home and stays in bed with her legs elevated.  (Tr. 61, 64.)  She reads and plays games on Facebook.  (Tr. 61.)  She spends 30 to 60 minutes on the computer, and then has to stop because her hand cramps up or goes numb.  (Tr. 62.)  When that happens, she has to rest her hand for 60 to 90 minutes.  *Id.*

- She is 5' 8" and weighs 330 pounds.  She has lost 30 pounds in the last couple months.  (Tr. 45-46.)

The VE testified Daniels had past relevant work as a telemarketer (sedentary, semi-skilled); nurse's aide (medium, semi-skilled); fast food worker (light, unskilled); and, deli worker/cashier (light, unskilled).  (Tr. 72.)  The ALJ then posed the following hypothetical:

> [A]ssume a hypothetical individual of the same age, education, and work experience as the claimant who retains the capacity to perform sedentary work with a sit/stand option allowing the person to briefly for one to two minutes alternate sitting or standing positions at 15 minute intervals without going off task, who's limited to no foot control operation bilaterally, who's limited to occasional posturals except no climbing of ladders, ropes, or scaffolds, no kneeling, crouching or crawling, who's limited to frequent fingering bilaterally, must avoid concentrated exposure to extreme cold and heat, must avoid concentrated exposure to wetness and humidity, must avoid all exposure to irritants, and who must avoid all exposure to unprotected heights, hazardous machinery, and commercial driving.  Would such an individual be capable of performing the claimant's past work?

(Tr. 72-73.)  The VE testified such an individual would not able to perform Daniels' past relevant work, but would be able to perform other jobs in the regional or national economy.  (Tr. 73.)  Specifically, the VE testified such an individual could perform the jobs of machine tender (sedentary, unskilled) and general office clerk, reception (sedentary, unskilled).  *Id.*

The ALJ then asked the following series of questions:

> Q:   Regarding tolerances, what are the customary tolerances that a typical employer would have as to an employee being late to work or having unexcused or unscheduled absences and if that were exceeded, what would be the result?

> A:   Your honor, if an employee is going to miss two or more days per month than I believe the supervisory person[nel] would become involved at that point attempting an intervention to correct that.  And if

8

it was not successfully corrected it would result in termination.

Q:   What are the customary number and lengths of breaks that a typical
     employer permits during the work day?

A:   Typically a 15 minute break in the morning, 15 in the afternoon and
     then 30 to 60 at lunch depending on the work site.

Q:   What are the customary tolerances for how much time during an eight
     hour work day a typical employer would permit an employee to be off
     task in addition to regularly scheduled breaks and if that were exceeded
     what would the result be?

A:   Your honor, if an employer is going to be off task 10 percent or more of
     the time, I believe that would completely eliminate a competitive work
     routine at any level and some work sites might be more stringent than
     that.

(Tr. 73-74.)

Daniels' lawyer then asked the VE the following question: "[i]f a person can lift only 10

pounds but can only stand 10 minutes at a time and no more than one and a half hours in an eight

hour day, can only sit for 15 minutes at a time, no more than two hours in a day, and cannot

climb, balance, crouch, kneel or crawl, can occasionally stoop, with those limitations would

there be any jobs?" (Tr. 75.)  The VE testified there would not be any jobs for such an

individual. *Id.*

Daniels' attorney then modified the ALJ's hypothetical to require no more than

occasional fingering and handling (as opposed to frequent fingering). (Tr. 75.)  The VE testified

this modification would eliminate the previously identified machine tender and general office

clerk/reception jobs. *Id.*  He further testified that the only job such an individual could perform

would be security monitor, but the additional restriction "would greatly limit the pool." *Id.*

Daniels' attorney then asked about an additional limitation that the hypothetical

individual would need to elevate their legs once an hour for 15 minutes. (Tr. 76.)  The VE

testified that "[t]hat would take them off task 10 percent or more of the time [and] I don't believe

that would be acceptable." *Id.*

### III.  Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the

9

time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[4]

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and, (3) she filed while she was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Daniels was insured on her alleged disability onset date, March 4, 2009, and remained insured through the date of the ALJ's decision, May 9, 2013.  (Tr. 19.)  Therefore, in order to be entitled to POD and DIB, Daniels must establish a continuous twelve month period of disability commencing between those dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

### IV.  Summary of Commissioner's Decision

The ALJ found Daniels established medically determinable, severe impairments, due to

---

[4]  The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity."  Second, the claimant must suffer from a "severe impairment."  A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled.  For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled.  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

obesity, diabetes mellitus with neuropathy, anemia, and asthma; however, her impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Tr. 21-22.) Daniels was found incapable of performing her past work activities, but was determined to have a Residual Functional Capacity ("RFC") for a limited range of sedentary work. (Tr. 23-32.) The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Daniels was not disabled. (Tr. 32-33.)

## V. Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by

11

substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  Analysis

### *Credibility*

Daniels argues the ALJ erred in finding her to be less than fully credible.  She maintains the decision improperly focused on the fact that she attended college courses and completed an externship, while omitting any discussion of her problems with performing other activities such as driving a car, attending functions at her daughter's school, and sitting for long periods of time. Daniels also maintains the ALJ improperly relied on her inability to lose weight or control her diabetes, arguing the ALJ impermissibly "played doctor" and ignored the fact that these conditions are not easily treated.  Daniels also complains the ALJ improperly based his credibility finding on the fact that she missed numerous medical appointments because he failed to consider other possible reasons for Daniels' non-compliance.

12

The Commissioner argues the ALJ properly assessed Daniels' credibility.  She argues the ALJ reasonably concluded that Daniels' "extensive activities" were inconsistent with her claim that she could not sit or stand, and had limited use of her hands.  The Commissioner further maintains the ALJ properly considered Daniels' non-compliance, noting she "was a no-show at 18 doctor appointments from 2009 to 2011."  (Doc. No. 15 at 13.)  Finally, the Commissioner asserts the ALJ properly concluded that the medical record, as a whole, did not suggest Daniels was precluded from performing sedentary work, arguing "the ALJ considered numerous portions of the record where Dr. Singh reported that Plaintiff was doing well and that she had normal examinations."  *Id*. at 14.

It is well settled that pain alone, if caused by a medical impairment, may be severe enough to constitute a disability.  *See Kirk v. Sec' of Health and Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).  When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms.  First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment.  Second, the ALJ "must evaluate the intensity, persistence, and limiting effects of the symptoms." SSR 96-7p.  Essentially, the same test applies where the alleged symptom is pain, as the Commissioner must (1) examine whether the objective medical evidence supports a finding of an underlying medical condition; and, (2) whether the objective medical evidence confirms the alleged severity of pain or whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.  *See Felisky v. Bowen,* 35 F.3d 1027, 1038-39 (6th Cir. 1994).

If these claims are not substantiated by the medical record, the ALJ must make a credibility determination of the individual's statements based on the entire case record.  *Id*. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ.  *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987).  The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly. *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).

13

Nonetheless, "[t]he determination or decision must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individuals statements and the reason for the weight." SSR 96-7p, Purpose section; *see also Felisky,* 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so"). To determine credibility, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. *See* SSR 96–7p, Purpose. Beyond medical evidence, there are seven factors that the ALJ should consider.[5] The ALJ need not analyze all seven factors, but should show that he considered the relevant evidence. *See Cross,* 373 F.Supp.2d at 733; *Masch v. Barnhart*, 406 F.Supp.2d 1038, 1046 (E.D. Wis. 2005).

Here, the ALJ accepted that Daniels suffered from the severe impairments of obesity; diabetes mellitus with neuropathy; anemia; and, asthma. (Tr. 21.) The decision discussed Daniels' self-reported limitations, and then thoroughly reviewed the medical evidence regarding her impairments. (Tr. 23-29.) Indeed, the ALJ's review of the medical record comprised nearly six single-spaced pages and included a detailed discussion of treatment notes from virtually every one of Daniels' physician appointments from February 2009 until the date of the hearing. *Id.*

Based on his review, the ALJ determined the credibility of Daniels' subjective allegations

---

[5] The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. SSR 96-7p, Introduction; *see also Cross v. Comm'r of Soc. Sec.*, 373 F.Supp.2d 724, 732-733 (N.D. Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

were "undermined for a number of reasons." (Tr. 23.) Specifically, the ALJ found Daniels (1) "engaged in activities which were demonstrative of greater functionality than alleged," including attending college, engaging in an externship, and spending time on the computer; and, (2) showed "ambivalence and clear lack of motivation by [failing] to follow through with medically advised treatment including attending appointments and losing weight." (Tr. 23-24, 25.) The ALJ also noted numerous examinations where Daniels was reported as "doing well" and "having no complaints." (Tr. 24.) The ALJ then concluded that "from evaluating the medical evidence of record, the undersigned is convinced the claimant has overstated the severity of her condition." (Tr. 24.)

The ALJ formulated the RFC as follows:

> Since March 4, 2009, the claimant has had only the residual functional capacity to perform a range of work activity that: requires no more than a 'sedentary' level of physical exertion; accommodates a sit/stand option allowing person to briefly, for one to two minutes, alternate sitting or standing positions at fifteen minute intervals without going off task; entails no bilateral foot control operation; entails no kneeling, crouching, crawling, or climbing of ladders/ropes/scaffolds and no more than occasional balancing, stooping, or climbing of ramps or stairs; entails no more than frequent bilateral fingering/fine manipulation; entails no concentrated exposure to temperature extremes, wet conditions, or humid conditions; entails no exposure to irritants such as fumes, odors, dust, or poorly ventilated areas; and entails no exposure to unprotected heights, hazardous machinery, and commercial driving. (20 CFR 404.1567(a) and 416.967(a)).

(Tr. 23.)

Concluding his step four analysis, the ALJ then summarized his credibility assessment as follows:

> For all of the foregoing reasons and in view of the evidence cited, the Administrative Law Judge does not find the claimant to be entirely credible and does not fully accept the claimant's subjective statements concerning her symptoms and limitations, as purported to exist throughout the period at issue. The claimant has medically determinable impairments that could reasonably be expected to cause some of the symptoms described, and the undersigned concludes that the claimant does experience symptoms related to such impairments, but not to the frequency or debilitating degree of severity alleged. In view of this determination concerning the claimant's credibility, the Administrative Law Judge does not accept medical findings or opinions that are based solely or primarily upon the claimant's subjective complaints.

> The foregoing evidence does indicate the claimant to have abnormalities, which are likely to impose some functional limitations However, the undersigned is

not convinced that such findings are indicative of any intractable condition that would preclude the claimant from performing all work activity for 12 consecutive months. The claimant has a treatment history which fails to demonstrate a totally disabling condition. More specifically, the claimant was non-compliant with appointments, and non-compliant with the recommendations of her treating sources with regards to losing weight. Moreover, during the relevant period of time, the claimant successfully completed college studies. The undersigned further notes that the above Residual Functional Capacity sufficiently accommodates for the effects that the claimant's "non-severe" impairments have upon her functionality. Moreover the above RFC also accommodates for any limitations resulting from diabetic neuropathy and/or limitations as to the claimant's upper extremities. In particular, the Administrative Law Judge notes that treatment history fails to demonstrate a consistent battery of complaints related to the claimant's upper extremities. Rather, the claimant has testified that she utilizes a notebook computer, and completed academic studies during the relevant time period, which undoubtedly would have required use of her upper extremities. However, in resolving any and all benefit of the doubt in the claimant's favor, the undersigned finds the above limitations. Overall, the Administrative Law Judge finds that the claimant has remained essentially capable of performing at least such limited range of work as has been defined within the parameters above. Therefore, having singularly had the opportunity to review the entire longitudinal record and to hear and observe the claimant's demeanor and sworn testimony at hearing, the undersigned concludes that the claimant's various impairments have combined since March 4, 2009, to impose only such functional limitations as have been defined within the parameters above.

(Tr. 31.)

The Court finds the ALJ did not improperly assess Daniels' credibility. The decision thoroughly considered both the medical and opinion evidence regarding Daniels' impairments. (Tr. 23-31.) As set forth above, the ALJ provided a number of specific reasons for finding Daniels to be less than fully credible, including the nature and degree of her daily activities; her non-compliance with attending medical appointments; and, the lack of objective medical evidence to support Daniels' claims regarding the severity of her impairments.

With regard to her daily activities, Daniels argues the ALJ mischaracterized the true extent of her abilities by failing to acknowledge her difficulties with driving, sitting for extended periods of time, and attending her daughter's school functions. Daniels maintains that her "sporadic and transitory activities" should not detract from her credibility because "such tasks do not require the sustained effort necessary for any substantial, sustained, and regular gainful employment." (Doc. No. 16 at 3.) The Court rejects this argument. As the ALJ correctly notes, Daniels testified she attended the Ohio Valley College of Technology from 2009 to 2010, where

she studied to be a medical assistant. (Tr. 24, 51.) She further testified she attended this program on a full-time basis and graduated with a GPA of 3.6. *Id.* Moreover, Daniels also reported completing an externship during this time frame, which required 360 hours of work. (Tr. 24, 51, 54.) Daniels explained she satisfied this externship requirement by working at the front desk of a chiropractor's office, where she scheduled patients, checked them in, and answered the phone. (Tr. 24, 54.) Daniels further testified she shopped once a week, used a computer, and played computer games on Facebook. (Tr. 24, 60-62.)

The Court finds the ALJ did not err in considering these activities as one factor in his credibility determination. Courts within this Circuit have found it is not improper for an ALJ to question a claimant's credibility based, in part, on her ability to successfully attend college classes on a full-time basis. *See, e.g., Alexander v. Apfel,* 17 Fed. Appx. 298, 301 (6th Cir. 2001) (in finding plaintiff was not disabled, ALJ properly considered fact that plaintiff was "able to achieve excellent grades in college during the relevant time"); *Bridges v. Comm'r of Soc. Sec.,* 2011 WL 1113442 at * 3 (N.D. Ohio Jan. 12, 2011) ("Full-time college attendance provided substantial evidence to contradict Plaintiff's claim of inability to engage in substantial gainful work activity"); *Jernigan v. Comm'r of Soc. Sec.,* 2014 WL 1328177 at * 15 (E.D. Mich. March 28, 2014) (finding ALJ "properly looked at plaintiff's school attendance, daily activities, and ability to care for her daughter as undermining the claimed severity of her symptoms and limitations"); *Chandler v. Comm'r of Soc. Sec.,* 2014 WL 2988433 at * 11 (S.D. Ohio July 1, 2014) (finding plaintiff's ability to attend college classes was a "legitimate factor" to take into account when evaluating the credibility of a social security claimant).[6] Moreover, the Court

_____

[6] Although cited by neither party, the Court finds that *Cohen v. Secretary of Department of Health & Human Services*, 964 F.2d 524 (6th Cir. 1992) and *Parish v. Califano*, 642 F.2d 188 (6th Cir. 1981) are distinguishable from the instant case. In those cases, the Sixth Circuit found that "[a]ttending college on a part-time basis was not the equivalent of being able to engage in substantial gainful activity." *Parish*, 642 F.2d at 191. *See also Cohen*, 964 F.2d at 531 ("[Cohen's] ability successfully to attend law school on a part-time basis (Cohen completed one year of law school over the course of three calendar years), while probative of whether she was capable of engaging in substantial gainful activity, in view of the nature of Cohen's

17

finds it was not unreasonable for the ALJ to determine that Daniels' abilities to attend full-time college classes over a two year period cast doubt on her claimed inability to sit for prolonged periods or use her hands to work on a computer.

Moreover, the Court notes the ALJ's credibility determination was not based solely on Daniels' ability to attend college courses and engage in other daily activities.  As set forth above, the decision also considered Daniels' treatment history and the lack of medical evidence to support the claimed severity of her impairments.  In particular, the ALJ noted numerous instances where Daniels was noted as "doing well" with "no complaints." (Tr. 24-25.)  Indeed, the ALJ expressly observed that "[t]hese subjective reports of having no complaints fails to demonstrate to the Administrative Law Judge the presence of a totally disabling condition(s) at this point in time." (Tr. 25.)  The ALJ also recounted numerous instances where Daniels was observed to have no edema in her extremities and emphasized that, as recently as April 2013, Daniels had a "relatively normal physical" in which her lungs were clear, she showed no signs of edema, and she had equal strength in her upper and lower extremities.  (Tr. 24-29.)  Finally, the ALJ noted the absence of a "consistent battery of complaints" related to Daniels' upper extremities.  (Tr. 31.)

Daniels argues the ALJ mischaracterized this evidence, stating that "[a]fter [the first half of 2009], the records do not show similar comments [that Daniels was 'doing well'] nor do records from the rest of 2011 and 2012 include any of those notes."  (Doc. No. 14 at 13.)  A review of the medical record indicates Daniels is incorrect.  In fact, the record reflects Daniels was described in Dr. Singh's treatment notes as "doing good" on December 23, 2009 (Tr. 457);

---

[chronic fatigue syndrome], does not provide substantial basis for the ALJ's conclusion that Cohen had the residual functional capacity to engage in substantial gainful employment").  Here, by contrast, Daniels testified that she attended college courses on a *full-time* basis in 2009 and 2010 and graduated with a 3.6 GPA after completing a 360 hour externship.  (Tr. 51, 54.)  Daniels does not direct this Court's attention to any evidence that she experienced any difficulty attending these classes due to her impairments.  Nor does she allege that her impairments are characterized by periods of exacerbation and remission, which was the case in both *Cohen* (chronic fatigue syndrome) and *Parish* (multiple sclerosis).

18

"doing well" with "no complaints" on April 1, 2011 (Tr. 495); "doing well" on October 18, 2011 (Tr. 520); and, "doing well" with "no complaints" on August 7, 2012. (Tr. 559.) Moreover, the ALJ correctly recounted the numerous instances throughout the record where Daniels was observed as having no edema in her extremities. While Daniels had occasional flare-ups with regard to the swelling in her feet, Dr. Singh's treatment notes otherwise consistently describe Daniels as having no edema, including his notes from August 2011, October 2011, January through October 2012, and January through March 2013. (Tr. 520-523, 559, 557, 625-626, 633, 650-651.) Moreover, Daniels fails to direct this Court's attention to any medical evidence contradicting the ALJ's determination regarding Daniels' upper extremities.

Finally, the ALJ determined Daniels was not credible in light of evidence that she was non-compliant with medical appointments and physician recommendations that she lose weight. (Tr. 25, 31.) Daniels argues this was error for a number of reasons. With regard to her missed medical appointments, Daniels argues the ALJ improperly discredited her testimony on this basis because he failed to consider other "possible reasons" for her non-compliance, including that she has "problems ambulating and driving." (Doc. No. 16 at 6.) Daniels also objects to the ALJ's reliance on the fact that she failed to lose weight. (Doc. No. 14 at 12.)

The Court finds it was not error for the ALJ to consider Daniels' history of missed medical appointments as one factor in his credibility analysis. It is well-established that an ALJ may consider a claimant's non-compliance with medical treatment in assessing credibility. *See Soto v. Comm'r of Soc. Sec*., 2014 WL 1576867 at * 8 (N.D. Ohio April 18, 2014); *Cook v. Comm'r of Soc. Sec*., 2012 WL 6839918 at * 9 (N.D. Ohio Sept. 26, 2012); *Becker v. Astrue*, 2011 WL 4007462 at * 7-8 (N.D. Ohio Sept. 9, 2011); Social Security Ruling 96-7p, 1996 WL 374186 at *7 (July 2, 1996). *See also Strong v. Social Security Administration,* 88 Fed. Appx. 841, 846 (6th Cir. 2004) (explaining that "in the ordinary course, when a claimant alleges pain so severe as to be disabling, there is a reasonable expectation that the claimant will seek examination or treatment. A failure to do so may cast doubt on a claimant's assertions of disabling pain."). Here, substantial evidence supports the ALJ's determination that Daniels frequently missed treatment

appointments between January 2009 and the May 2013 decision. Specifically, the record reflects Daniels missed five appointments in 2009; six appointments in 2010; six appointments in 2011; and, three appointments in 2012. (Tr. 453, 454, 456, 457, 458-461, 439, 475, 462, 520, 521, 635.) Faced with a similar history of non-compliance, courts within this Circuit have found that an ALJ is entitled to draw a negative inference from a claimant's repeated failure to attend medical appointments. *See e.g. Cook*, 2012 WL 6839918 at * 9 (stating that "Cook frequently missed treatment appointments between January 2009 and March 2010, and the ALJ was entitled to draw the inference that Cook did not regard these treatments to be of great importance"); *Becker*, 2011 WL 4007462 at * 8 (finding ALJ did not err in rejecting claimant's claims of disabling pain, in part, "based upon Plaintiff's failure to make and keep follow-up appointments").

Daniels nonetheless claims the ALJ erred because he failed to consider "possible reasons" for her non-compliance, including evidence suggesting Daniels "has problems ambulating and driving." (Doc. No. 16 at 6.) She argues that "[t]hese problems could certainly interfere with a claimant's ability to get to scheduled appointments." *Id*. Daniels, however, does not direct this Court's attention to any evidence in the record that her "problems ambulating and driving" actually did cause her to miss any medical appointments. In the absence of such evidence, the Court finds the ALJ did not err in considering Daniels' non-compliance with medical appointments as one factor in assessing her credibility.[7]

While Daniels urges the Court to find that the reasons given by the ALJ do not demonstrate a lack of credibility, it is not this Court's role to "reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment

---

[7] As noted above, Daniels also complains it was improper for the ALJ to discredit her because she failed to lose weight. Even if the ALJ did err in this regard, any such error is harmless as it is clear the ALJ's credibility analysis was also properly based on the other factors discussed above; i.e., Daniels' ability to attend full-time college classes; the lack of medical evidence to support the claimed severity of her impairments; and her non-compliance with medical appointments.

for that of the ALJ." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011) (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995)).  *See also Vance v. Comm'r of Soc. Sec.*, 2008 WL 162942 at * 6 (6th Cir. Jan. 15, 2008) (stating that "it squarely is *not* the duty of the district court, nor this court, to re-weigh the evidence, resolve material conflicts in testimony, or assess credibility.")  The ALJ provided sufficiently specific reasons for his credibility determination and supported those reasons with reference to specific evidence in the record.  Daniels' assignment of error is without merit.

### Treating Physician Mohinder Singh, M.D.

Daniels also argues the ALJ erred by failing to give controlling weight to the opinions of treating physician, Mohinder Singh, M.D.  Daniels maintains Dr. Singh's opinions should have been fully credited because they are supported by objective medical evidence and "there are no conflicts in the Plaintiff's testimony and [Dr. Singh's] opinion about her abilities." (Doc. No. 14 at 11.)  She further asserts the ALJ erred in failing to provide good reasons for rejecting some, but not all, of Dr. Singh's findings, arguing ALJs "are not permitted to cherry-pick through medical opinions and give weight to the portions of the opinions that support a finding that a claimant is not disabled and disregard the portions of the opinion that do not."  (Doc. No. 16 at 8.)

The Commissioner argues the ALJ reasonably gave Dr. Singh's opinions limited weight. She first notes that the ALJ incorporated most of Dr. Singh's opinions into the RFC.  With respect to the specific opinions that are not reflected in the RFC, the Commissioner asserts the ALJ gave several good reasons for rejecting them, including that they were based on Daniels' subjective complaints and inconsistent with the nature and extent of Daniels' daily activities.

Under Social Security regulations, the opinion of a treating physician is entitled to controlling weight if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Meece v. Barnhart*, 2006 WL 2271336 at * 4 (6th Cir. Aug. 8, 2006); 20 C.F.R. § 404.1527(c)(2).  "[A] finding that a treating source medical opinion . . . is inconsistent

with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (*quoting* Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 2006 WL 2271336 at * 4 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.) Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[8]

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers*, 486 F.3d at 242 (quoting Soc. Sec. Ruling 96-2p, 1996 SSR LEXIS 9 at * 5). The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id*. (quoting *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004)). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544. Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

---

[8] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406. The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984). According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability. This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled. "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id.* It is the Commissioner who must make the final decision on the ultimate issue of disability. *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

In the instant case, the ALJ weighed Dr. Singh's opinions as follows:

> The Administrative Law Judge has accorded limited weight to the findings and conclusions of Dr. Singh. In particular, on January 5, 2012, Dr. Singh noted that the claimant was not able to work do [sic] to foot problems. (Exhibit 16F21). On February 29, 2012, Dr. Singh reported that the claimant was to be off work due to feet swelling and pain. (Exhibit 16F21.) On November 12, 2012, Dr. Singh opined that the claimant was unable to work and would miss more than four days per month. This practitioner also indicated that the claimant was an advanced diabetic and had numbness of the hands and feet. This doctor also reported the claimant had postural restrictions and had limitations as to handling, feeling, and pushing/pulling along with limitations as to hazards, temperature extremes, irritants, and humid conditions. Finally, this doctor opined that the claimant's ability to sit, stand, walk, lift and carry were affected by the impairment. This doctor opined that the claimant could lift and carry ten pounds. (Exhibit 17F). On April 29, 2013, Dr. Singh opined that the claimant would miss more than four days of work per month, and was unable to work. It was further reported that the claimant would miss more than 25% of a standard work day, and that the claimant had numbness in the hands and feet due to advanced diabetes. Moreover, the claimant's handling, feeling, and pushing/pulling were reported as being affected by her impairments. It is also noted that the claimant had environmental restrictions including those related to heights, moving machinery, temperature extremes, chemicals, dusts, fumes, and humidity. The claimant was further

23

reported as being only able to lift and carry 10 pounds. Her sitting, standing, walking, lifting, and carrying were reported as being affected by her impairments. (Exhibit 25F). Ultimately, the undersigned notes that the above RFC is for a sedentary 'physical' exertional capacity which is generally consistent with the ten pound restriction noted by this doctor. However, the Administrative Law Judge is convinced that there is no basis for this doctor to find the claimant to be unable to engage in work and to miss significant amounts of work time during the month along with other limitations. The undersigned is convinced that such findings are inconsistent with some of the activities reported by the claimant. More specifically, the claimant reported that she was able to attend and successfully complete college courses in 2009 and 2010. Second, from examining the full record, Dr. Singh appears to have placed too great of weight on the claimant's subjective statements, and overstates her limitations. Finally, the Administrative Law Judge concludes that Dr. Singh's conclusions as to the claimant's limitations are overly severe and inconsistent with the full longitudinal record. In particular, this doctor's findings are inconsistent with the treatment history, including medical evidence showing the claimant to be non-compliant with medical recommendations and on occasion to have normal/benign examinations to the extent that as of April 2013 the claimant had a relatively normal examination. Ultimately, such is a longitudinal demonstration that the claimant is not subjected to a totally disabling condition(s) for a continuous period of 12 months. Therefore, these opinions rendered by this doctor have been accorded limited weight.

(Tr. 29-30.)

As an initial matter, the Court notes the ALJ did, in fact, incorporate a number of the limitations offered by Dr. Singh into the RFC. Specifically, by articulating a "sedentary level of physical exertion," the ALJ imposed a lift and/or carry restriction of 10 pounds, which is consistent with Dr. Singh's November 2012 and April 2013 opinions.[9] *See* 20 C.F.R. § 404.1567(a). In addition, the ALJ adopted Dr. Singh's opinion that Daniels could never crouch,

---

[9] In Social Security Ruling ("SSR") 83-10, 1983 WL 31251 (1983), the Social Security Administration elaborated on the definition of "sedentary" work as follows: "The regulations define sedentary work as involving lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although sitting is involved, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. By its very nature, work performed primarily in a seated position entails no significant stooping. Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions. 'Occasionally' means occurring from very little up to one-third of the time. Since being on one's feet is required 'occasionally' at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday."

kneel, crawl, or climb ladders/ropes/scaffolds. The RFC also incorporated Dr. Singh's opinions that Daniels was restricted from heights, moving machinery, temperature extremes, chemicals, dust, fumes, and humidity. Moreover, as Dr. Singh did not specify the degree to which Daniels' abilities were affected by her condition, the RFC arguably accounted for Dr. Singh's opinions regarding Daniels' abilities to handle, feel, and push/pull by restricting her to no more than frequent bilateral fingering/fine manipulation and no bilateral foot control operation.

While Daniels does not clearly specify which of Dr. Singh's opinions she believes were improperly rejected, it appears she is contesting the ALJ's failure to adopt Dr. Singh's opinions that Daniels can stand and/or walk for a total of only 1.5 hours (10 minutes without interruption); sit for a total of only 2 hours (15 minutes without interruption); never balance; and, never climb ramps and stairs. It would also appear Daniels is contesting the ALJ's rejection of Dr. Singh's opinion that Daniels would likely be "off task" for 25% or more of the workday and, further, would miss more than 4 days of work per month as a result of her impairments or treatment.

The Court finds the ALJ articulated "good reasons" for rejecting these particular opinions. The first reason provided by the ALJ was that the opinions at issue are "inconsistent with some of the activities reported by the claimant," such as her ability to "attend and successfully complete college courses in 2009 and 2010." (Tr. 30.) The Court finds this basis for rejecting Dr. Singh's opinions to be supported by substantial evidence. As noted *supra*, Daniels attended college courses on a full-time basis from 2009 to 2010 and graduated with a GPA of 3.6. (Tr. 24, 51.) She also completed a 360 hour externship during this time frame by working at the front desk of a chiropractor's office, where she scheduled patients, checked them in, and answered the phone. (Tr. 24, 54.)

The Court finds it was not improper for the ALJ to conclude that Daniels' abilities to successfully complete her college courses and externship were inconsistent with Dr. Singh's rather extreme standing/walking and sitting restrictions. Nor was it unreasonable for the ALJ to discount Dr. Singh's opinions regarding Daniels' predicted absenteeism and limited ability to stay on task, in light of her ability to attend college full-time over a two year period; graduate

25

with an impressive 3.6 GPA; and, successfully complete her externship. Indeed, this Court has previously found that an ALJ's rejection of a treating physician opinion was supported by substantial evidence where the rejection was based, in part, on the claimant's demonstrated ability to successfully attend college courses. *See e.g. Foreman v. Colvin*, 2013 WL 3200615 at * 10 (N.D. Ohio June 24, 2013). Accordingly, the Court finds the ALJ's rejection of Dr. Singh's opinions because they were inconsistent with Daniels' activities is supported by substantial evidence in the record.

The ALJ also rejected Dr. Singh's opinions on the grounds that "Dr. Singh appears to have placed too great of weight on the claimant's subjective statements and overstates her limitations." (Tr. 30.) The ALJ does not provide any further explanation regarding this particular reason for rejecting Dr. Singh's opinions. However, earlier in the decision, the ALJ discussed Daniels' self-reported limitations; thoroughly recounted the medical evidence regarding her diabetes, obesity, anemia, and asthma; and, articulated a number of specific reasons for finding Daniels' subjective allegations to be lacking in credibility. (Tr. 23-29.) As noted previously, these reasons included the nature and extent of Daniels' daily activities; the inconsistency of Daniels' subjective allegations with the medical evidence of record; and, Daniels' failure to attend numerous medical appointments. *Id.*

Courts have held that "[w]hen a treating physician's opinion is based on a claimant's self reports which are themselves not credible, it is not error to assign little weight to the opinion." *Webb v. Comm'r of Soc. Sec.*, 2014 WL 129237 at * 6 (E.D. Tenn. Jan. 14, 2014) (citing *Vorholt v. Comm'r of Soc. Sec.,* 409 Fed App'x 883, 889 (6th Cir. 2011)). *See also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (affirming ALJ's rejection of treating physician opinions where "[t]hese doctors formed their opinions solely from Smith's reporting of her symptoms and her conditions and the ALJ found that Smith was not credible"); *Stevenson v. Astrue*, 2010 WL 3034018 at * 8 (M.D. Tenn. Aug. 3, 2010) (finding that a medical opinion "based on [an] incredible self-report could reasonably be given insignificant weight by an ALJ when the credibility determination is based on substantial evidence"). As explained *supra*, the

ALJ properly assessed Daniels' credibility and substantial evidence supports the decision's finding that the credibility of her subjective allegations was "undermined for a number of reasons." (Tr. 23.) Accordingly, the Court further finds that the ALJ's rejection of Dr. Singh's opinions because they were based on Daniels' subjective statements was not improper and is supported by substantial evidence in the record.

Finally, the ALJ found Dr. Singh's opinions were "overly severe" and "inconsistent with the treatment history, including medical evidence showing the claimant to be non-compliant with medical recommendations and on occasion[] to have normal/benign examinations to the extent that as of April 2013 the claimant had a relatively normal examination." (Tr. 30.) For the reasons set forth *supra*, the Court finds the ALJ did not err in discounting Dr. Singh's opinions based, in part, on the fact that Daniels' missed numerous medical appointments. As noted previously, Daniels missed twenty appointments between January 2009 and May 2013. It was not unreasonable for the ALJ to infer that Daniels' failure to appear for multiple doctor appointments was inconsistent with the extreme imitations offered by Dr. Singh. Nor was it unreasonable for the ALJ to discount Dr. Singh's opinions in light of the numerous references in his treatment notes that Daniels was "doing well" with "no complaints," and often showing no signs of edema.

Accordingly, and based on the above, the Court finds the ALJ sufficiently articulated good reasons for rejecting Dr. Singh's opinions regarding Daniels' predicted absenteeism and abilities to stand/walk; sit; balance, climb, and stay on task. The Court further finds the ALJ's decision to reject these opinions is supported by substantial evidence in the record.

### *Hypothetical*

In her final assignment of error, Daniels argues the ALJ erred at step five of the sequential evaluation because "he failed to rely on a hypothetical question that accurately reflected [her] limitations." (Doc. No. 14 at 14.) Specifically, Daniels maintains the hypothetical posed to the VE did not account for all of her restrictions because it failed to include Dr. Singh's opinions regarding Daniels' inabilities to stay on-task and maintain a regular schedule.

A hypothetical question must precisely and comprehensively set forth every physical and mental impairment that the ALJ accepts as true and significant.  *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).  Where the hypothetical question is supported by evidence in the record, it need not reflect unsubstantiated allegations by the claimant.  *See Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990).  In fashioning a hypothetical question to be posed to a VE, the ALJ is required to incorporate only those limitations that he accepts as credible.  *Griffeth v. Comm'r of Soc. Sec.*, 217 Fed. Appx. 425, 429 (6th Cir. 2007) (*citing Casey v. Sec'y of HHS*, 987 F.2d 1230, 1235 (6th Cir. 1993)).  However, where the ALJ relies upon a hypothetical question that fails to adequately account for all of the claimant's limitations, it follows that a finding of disability is not based on substantial evidence.  *See Newkirk v. Shalala*, 25 F.3d 316, 317 (6th Cir. 1994).

Because the Court has found that the ALJ reasonably rejected the limitations set forth in Dr. Singh's opinions, they need not have been incorporated into the hypothetical questions.  Accordingly, Daniels' argument that the ALJ improperly relied on VE testimony at step five is without merit.

Finally, in her Reply Brief, Daniels argues for the first time that "the ALJ's RFC in regards to Plaintiff's physical abilities is not fully consistent with any other medical opinion in the record."  (Doc. No. 16 at 8.)  She maintains the ALJ erred because, "[t]o develop his RFC, the ALJ had to discredit, to some extent, every medical opinion in the record in regards to Plaintiff's physical problems."  *Id.*  at 8-9.  Because the ALJ "created an RFC out of thin air," Daniels maintains the RFC "cannot stand and a remand is warranted to determine Plaintiff's true RFC."  *Id.* at 9.

The Court will not address arguments raised for the first time in a Reply Brief.  As another court within this District has explained:

> It is well-established that a party should not raise new arguments in a reply brief. *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008). A reply brief provides a plaintiff the opportunity to respond to arguments raised for the first time in the defendant's brief.  But, the plaintiff cannot wait until its reply brief to assert new arguments because such a practice would effectively deprive the

defendant of the opportunity to expose weaknesses in the plaintiff's arguments. *Id*. "These waiver and forfeiture rules ensure fair and evenhanded litigation by requiring parties to disclose legal theories early enough in the case to give an opposing party time not only to respond but also to develop an adequate factual record supporting their side of the dispute." *Winnett v. Caterpillar, Inc*., 553 F.3d 1000, 1007 (6th Cir. 2009). District courts in this circuit have applied this doctrine in Social Security cases. *E.g.Caley v. Astrue*, No. 5:11–CV–1146, 2012 WL 1970250, at *15, n. 11 (N.D.Ohio June 1, 2012) (Vecchiarelli, J.); *Hamilton v. Comm'r of Soc. Sec*., No. 1:09–CV–260, 2010 WL 1032646, at *6 (N.D.Ohio Mar.17, 2010) (White, J.); *Johnson v. Comm'r of Soc. Sec*., No. 1:09–CV–967, 2011 WL 4954049, at *11 (W.D.Mich. Sept.22, 2011).

*Bender v. Comm'r of Soc. Sec*., 2012 WL 3913094 at * 8 (N.D. Ohio Aug. 17, 2012). Because Daniels failed to challenge the RFC on this basis in her Brief on the Merits, the Court deems this argument waived and will not address it herein.

## VII. Decision

For the foregoing reasons, the Court finds the decision of the Commissioner supported by substantial evidence. Accordingly, the decision is AFFIRMED.

IT IS SO ORDERED.

/s/ Greg White
U.S. Magistrate Judge

Date: July 16, 2015